UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

NISREEN FARAH,
on behalf of minor child, M.A.,                      Case No. 1:16-cv-624

        Plaintiff                                            Black, J.
                                                                               Bowman, M.J.
    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Nisreen Farah filed this Social Security appeal in order to challenge the Defendant's finding that her minor child (hereinafter "MA") is no longer disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents multiple claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be REVERSED, because it is NOT supported by substantial evidence in the administrative record.

**I. Background**

Plaintiff's daughter, MA, was born in July 2002 in Pennsylvania. As a one-year-old, she was diagnosed with Langherhaus Cell Histocytosis ("LCH"),[1] chronic recurrent multifocal osteomyelitis ("CRMO"), anemia, and arthropathy. Plaintiff applied for SSI benefits for her infant daughter soon thereafter, and that application was approved. As of April 1, 2004, MA was found both to meet and to medically equal Listing 113.03A,

---

[1] According to the National Institutes of Health, LCH is "sometimes associated with cancer," and treatments frequently include chemotherapy or radiation. The same site states that "in the majority of children, the disease resolves itself." https://rarediseases.info.nih.gov/diseases/6858/langerhans-cell-histiocytosis (accessed on May 19, 2017).

based upon the severity of her LCH, which required chemotherapy, anemia that required blood transfusions, and multiple bone lesions. (Tr. 612-613). At the time, she had multiple lytic lesions in her skeleton. (*Id; see also* Tr. 101, 504-505). Early treatment included a feeding tube. (Tr. 501). An abdominal CT showed an enlarged liver and spleen. Her chemotherapy treatment for LCH lasted for about five years. (*See* Tr. 101; *see also* Tr. 43, Tr. 443-444). Six months after chemotherapy ended, new bone lesions appeared, and she remained in treatment in Pennsylvania until her move to Ohio with her family in 2008. (Tr. 444).

In November 2008, MA began treating at the Cincinnati Children's Hospital. Shortly after beginning treatment, new bone lesions were detected. However, when a lesion was biopsied, doctors discovered it did not have the characteristic features of LCH, the primary condition on which her initial disability determination was based. (Tr. 444). Plaintiff's physicians changed her diagnosis to CRMO alone (without LCH), and added a new drug (Enbrel) to her treatment regimen based upon the new diagnosis. (*Id.*) According to the National Institutes of Health, CRMO is "an inflammatory bone condition," with symptoms of "recurrent episodes of pain and joint swelling, with or without fever," which symptoms "typically begin in childhood." Like LCH, the NIH website lists CRMO under rare diseases, and states: "For most children, CRMO resolves after many years without lasting effects. …CRMO can cause slow growth and permanent bone deformity." https://rarediseases.info.nih.gov/diseases/6108/chronic-recurrent-multifocal-osteomyelitis (accessed May 18, 2017).

MA had a good initial response to her new drug therapy for her CRMO and all other immunosuppressive medications were discontinued. Nine years after MA was determined to be disabled, when she was 10 years old, the Commissioner re-evaluated

2

her claim to determine whether her disability continued. On May 9, 2013, the agency determined that MA was no longer disabled, as of May 1, 2013. (Tr. 437-442, 447-452; *see also* Tr. 99-107). That determination was upheld upon reconsideration by a State Agency Disability Hearing Officer. (Tr. 109-110).

In April 2014, Plaintiff sought a hearing *de novo* before an Administrative Law Judge ("ALJ"). On December 2, 2014, an evidentiary hearing was held before ALJ Emily Ruth Staturn, at which Plaintiff appeared without counsel, and gave testimony. (Tr. 35-59). MA, by then aged 12, did not appear, and no other testimony was taken. On April 7, 2015, ALJ Staturn affirmed the termination of SSI benefits in a written decision, concluding that MA was no longer disabled. (Tr. 16-29).

**II. Relevant Standards of Review and Issues Presented**

The Social Security Act generally requires continued eligibility for benefits after the initial determination of eligibility, and requires the termination of benefits if an individual is no longer eligible. *See* 42 U.S.C. §423(f). A review of an individual's continued eligibility for benefits is called a "continuing disability review" ("CDR"), Although MA's benefits review did not occur until 9 years after her original disability decision, a medical CDR is often performed as frequently as every 3 years. *See* 42 U.S.C. § 1382c(a)(H)(ii)II; *see also* https://www.ssa.gov/ssi/txt-cdrs-ussi.htm (accessed May 18, 2017) ("The law requires us to perform a medical CDR approximately every 3 years, unless we determine you have a condition that we expect will improve sooner than that. However, if you have a condition that is not expected to improve, we will still review your case, but not as often as every 3 years.").

The regulatory framework used for the continuing disability review of SSI benefits previously awarded to a child is set forth at 20 C.F.R. § 415.994a. The CDR

3

determination is made "on a neutral basis, without any initial inference as to the presence or absence of disability being drawn" from the prior benefits award. §416.994a(a)(2). In the first step of the three-step CDR process, the analysis focuses on whether there has been "medical improvement" from the most recent favorable determination (i.e., the "comparison point decision" or "CPD"). *Id.* Here, MA's CPD was her original disability determination in 2004. Medical improvement is defined as "any decrease in the medical severity" of her LCH impairment. *Id*; *see also* §416.994a(c). The ALJ found medical improvement between April 1, 2004, when MA first met or equaled Listing 113.03A, and May 2013, when MA's records reflected that her LCH "improved to the point that it was more consistent with a diagnosis of CRMO," the drug Embrel was added, and all other medications were discontinued. (Tr. 19). Plaintiff no longer uses a feeding tube or receives chemotherapy or blood transfusions. Plaintiff does not contest the ALJ's finding of medical improvement.

At step two of the CDR analysis, the agency considers whether the child's impairment still "meets or medically or functionally equals the severity of" the original listing under which she was previously found to be disabled. 20 C.F.R. § 416.994a(a)(1); § 416.944a(b)(2). The ALJ found that MA's CRMO impairment does not meet, medically equal, or functionally equal Listing 113.03A, the prior disability listing for MA's LCH, which required chemotherapy, anemia that required blood transfusions, and multiple bone lesions. As the ALJ noted, Listing 113.03A is used for "malignant solid tumors," which corresponded with MA's prior diagnosis but not with CRMO. (Tr. 20). *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 – Part B2. Listing 313.03A itself anticipates re-evaluation "[a]fter 24 months from the date of the initial diagnosis," by explaining that at that time, Listing level severity will be based on "any

4

residual impairment(s) under the criteria for the affected body system." *Id.* In this appeal, Plaintiff does not contest the ALJ's determination that MA's CRMO diagnosis no longer meets, or medically or functionally equals, her prior LCH condition, which met and medically equaled Listing 313.03A for malignant solid tumors.

When a child no longer meets or equals the Listing under which they were previously determined to be disabled, the Commissioner is required at step 3 of the CDR analysis to "consider whether [the child's] current impairment(s) are disabling under the rules in § 416.924" as set forth in more detail under § 416.994a(b)(2) and § 416.994a(b)(3) (explaining that if the prior impairment no longer meets or equals the prior Listing, the agency will consider whether the child remains disabled under §416.924(c) and (d)), In general, a child's benefits will be terminated "only if we also find that you are not currently disabled." §416.994a(a)(1). On the record presented, Plaintiff argues that the ALJ erred in finding that MA is no longer disabled based upon continuing limitations from her CRMO.

To be eligible for benefits, a child must have a medically determinable impairment which results in marked and severe functional limitations and which has lasted, or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. §1382c(a)(3)(C)(i). There is no question that CRMO is a "severe" impairment. However, the implementing regulations define the standard of "marked and severe functional limitations" in terms of "listing-level severity." *See* 20 C.F.R. §§416.902, 416.906, 416.924a, 416.926. Here, the ALJ determined that, since May 1, 2013, MA's CRMO and remaining impairments failed to result in any functional limitations that were either marked or severe, or of listing-level severity. (Tr. 23). In other words, the ALJ concluded that none of MA's impairments, alone or in combination,

5

met or medically equaled any Listed Impairment that would entitle her to continuing benefits. The sole focus of Plaintiff's appeal to this Court is on the ALJ's conclusion that MA does not meet or equal any Listing, and the record (or lack of record) to support that conclusion.

A claimant can either medically equal a Listing, or she can "functionally equal" a Listing. Plaintiff argues that she functionally equals a Listing. To determine functional equivalence, the Commissioner is required to assess the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. §416.926a(b)(1). To prove that MA has an impairment that is functionally equivalent to a Listing, Plaintiff must show that MA's impairments resulted in "marked" limitations in at least two of the six domains, or "extreme" limitations in at least one domain. 20 C.F.R. §416.926a(d).

The ALJ determined that MA has no limitations at all in the first five listed domains, and "less than marked" limitations in the domain of health and physical well-being. (Tr. 23). Plaintiff complains of error in the ALJ's findings in the domains of MA's ability to manipulate and move objects, her ability to care for herself, and especially in the domain of her health and physical well-being.

The Appeals Council denied Plaintiff's request for review. Therefore, the ALJ's decision stands as the Defendant's final determination. Through new counsel appointed after the ALJ's adverse decision, Plaintiff timely filed this judicial appeal of the termination of her daughter's benefits. In addition to challenging the ALJ's findings that MA lacked "extreme" and/or "marked" deficits in several domains, Plaintiff argues that

6

remand is required because the ALJ failed to fully develop the record and failed to consider MA"s functional equivalence to Listing 114.09.

In reviewing the Commissioner's termination or denial of benefits, the court's first inquiry is to determine whether the ALJ's decision is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. ... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

Based on the ALJ's failure to develop a complete record in this case, I conclude that the decision to terminate MA's benefits is not supported by substantial evidence.

### III. Substantial Evidence Analysis

#### A. Development of the Record

An ALJ has a "special duty" to fully develop the record of a claimant who appears before her without representation, and the reviewing court must scrutinize the record with care in such cases to ensure that the heightened duty was fulfilled. *Lashley v.*

7

*Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983). The ALJ failed to comply with that duty in this case.

The hearing before the ALJ was brief, lasting just 24 minutes. *Compare Lashley, supra,* (noting that hearing lasted a mere 25 minutes). Although Plaintiff voluntarily waived her right to representation, she was hesitant in doing so, explaining she did not look for an attorney "because I can't afford to pay one. So, that's why I was worried to hire…." (Tr. 38). Records suggest that although Plaintiff is fluent in English, her native language is Arabic. The ALJ properly counseled her that she could continue the hearing if she desired, and that "[t]here are organizations that can assist you to obtain a representative free of cost," who "would only receive compensation if your daughter prevails." (Tr. 38). Plaintiff responded that she wished to proceed "this time by myself. But in the future if, you know --…[b]ecause…honestly, I'm going to keep fighting for my daughter because I know she's really ---…disability. So…" (Tr. 39).

Unfortunately, Plaintiff was not an effective advocate for her daughter. While passionate as only a mother can be, she clearly did not comprehend the precise nature of the inquiry, such as the most salient aspects of her daughter's condition to convey, or the relevant sequential analysis on which the ALJ was focused. Plaintiff did not appear to comprehend the basis for the ALJ's questions, which only superficially explored the six domains by asking questions about MA's grades in school and ability to dress and bathe herself over the course of just 13 pages. (Tr. 43-56). *Accord Lashley*, 768 F.2d at 1052 (noting that superficial questioning of inarticulate claimant is likely to elicit responses that fail to accurately portray the extent of limitations). Plaintiff did not elaborate on her responses to the ALJ's inquiries, even though several responses suggested further development of the record may have been helpful. For example,

8

Plaintiff testified that her daughter cannot do chores due to pain and fatigue, cannot walk for more than 5 minutes without pain, cannot walk for more than 10-15 minutes total or play with friends for more than that time due to pain and fatigue. (Tr. 45-48, 205). Plaintiff stated that MA experiences pain upon virtually any movement, and that her pain is significant enough to cause her to wake 4-5 times per night. (Tr. 43, 48-49, 204-211). She cannot run or jump. Her illness and/or treatment causes frequent infections. (Tr. 46). There was some evidence of frequent school absences due to pain and doctor's appointments, as well as some evidence that Plaintiff was unable to physically attend school at times at times due to her condition,[2] but the ALJ did not develop the record on any of these issues, and Plaintiff appears to have been unaware of the importance of such information.

Rather than focusing on the most relevant information in support of her daughter's claim, Plaintiff repeatedly questioned the basis for the cessation of benefits in a poorly articulated manner that suggested little understanding of the process.

> [Plaintiff] A: The only thing, I don't know how it's –she's not considered as disability, which is – last time, I don't know, I talked to other judge, I think –
>
> [ALJ] Q: Mm-hmm.
>
> A: And they sad in the letter she's not disability anymore. And she's six, and she was one, and now she's 12. And she's still sick. So, how come, if at 12 years old she's in pain?
>
> Q: Okay.
>
> A: And I know if I stop her [Enbrel] , she's – I can't stop her [Enbrel] for, you know, a while. And I know she's going to be back in chemo, and back in stuff. And she's going to be disabled, like, really bad again.

---

[2]The single report card for the 2012-2013 school year reflects 8 absences and one "tardy". (Tr. 291). However, Dr. Grom's letters reflect a worsening of MA's condition to the point that she needed home-bound instruction. (Tr. 512, 663). Later report cards confirm higher absenteeism. (Tr. 289, 13 absences plus 2 "non-absence" events; Tr. 288, 10 absences plus 2 "non-absence" events).

Q  Okay.

A:  So, I don't know why they don't think about – if she's not disabled, how come someone can be sick from one until 12?

Q:  Okay.

(Tr. 57).

Plaintiff responded affirmatively when the ALJ asked if MA receives special services through school, but failed to articulate the precise nature of those services, leaving the impression that, at most, MA had very mild restrictions in gym class.  (Tr. 50).  The ALJ did not obtain any of the school records, and Plaintiff provided only one such record: a report card for the 2012-2013 academic year, apparently in response to a questionnaire that explicitly directed her to "send a copy of the child's most recent grade/progress report."  (Tr. 209).  In trying to answer the ALJ's question about school services, which ordinarily would include an IEP under the IDEA, or a 504 Plan under the Rehabilitation Act of 1973, Plaintiff struggled, stating:  "I know that the  -- she's in a plan called 401, I think."  (Tr. 50).[3]  School records obtained by Plaintiff's counsel for this judicial appeal confirm that Plaintiff has had a 504 plan since March 2013, which contains limitations beyond gym class, including home instruction for frequent absences, alternative seat assignments when in pain, preferential order in line, use of an elevator, and extra time for bus transportation in cold weather. (Tr. 287).

Plaintiff also provided no explanation of why MA herself did not appear, and the ALJ did not inquire. One would assume that at age 12, MA might have provided relevant information.

---

[3]Plaintiff also testified that MA has difficulty in language arts.  On a questionnaire, she indicated that her daughter is enrolled in an "ESL" program, which acronym commonly refers to "English as a Second Language." (Tr. 205).  On another page, Plaintiff wrote:  "I think she has IEP with school 501 plane [sic]…But I'm not sure if that's same IEP" [sic] (Tr. 209).

10

When the ALJ asked Plaintiff if she had reviewed the medical records, she responded "for a little bit, yeah." (Tr. 40). The ALJ asked Plaintiff if there was anything missing, but the only thing Plaintiff noticed was the absence of a note from a recent doctor's appointment in August 2014, in which "the doctor found a new lesion." However, Plaintiff said she "brought the discharge papers" to the hearing. (Tr. 40). In response to Plaintiff's testimony that MA had a follow-up appointment a few days later, the ALJ asked her to submit any follow-up notes within two weeks.

On a similar record involving a 6-year-old child with incontinence issues, another court within the Sixth Circuit remanded based upon the failure of the ALJ to fulfill the "heightened duty" to develop the record, even though in that case (unlike here) the ALJ had the benefit of two consultative examinations ordered after the evidentiary hearing, which the child attended. In *Coplen v. Com'r*, 2010 WL 1526108 at *5 (M.D. Tenn. March 23, 2010), R&R adopted at 2010 WL 1525725 (April 15, 2010), the court emphasized that the ALJ was required to do more than simply accept review of the record as presented, to satisfy the heightened duty standard:

> That duty is all the more luminous in this case, where plaintiff – notwithstanding her obvious devotion to [her son's] care and cause – was plainly incapable of understanding or advancing her son's best interests within the parameters of the disability adjudication process. Indeed, plaintiff waived or attempted to waive her right to a hearing in this matter on reconsideration [of the initial agency decision] and at the ALJ level…, and failed to bring [her son] along to the ALJ hearing, where he might have provided some valuable insight into his condition upon gentle questioning by the ALJ. Failing to present [the child] at the hearing or address any specific difficulties he may have experienced even when his school day was not interrupted by a fecal accident, plaintiff gave the impression that [her son's] school functioning was generally normal…. However, she did testify that [her child] followed directions at school only sometimes, explaining that "[h]e gives the teacher a hard time some days when he has bad days at school"….clarifying that such "bad days" were days when he would have a fecal accident in his pull-ups.

11

*Id.*

In *Coplen*, the court was unpersuaded that, just because the parent had freely and voluntarily waived her statutory right to counsel, she should be viewed as an effective advocate for her child.

> While it is clear that a claimant may waive her statutory right to counsel, as plaintiff did here, the ALJ's special duty to develop the record required more than her superficial probing into the issue of [the child's] school functioning…particularly given plaintiff's testimony regarding "bad days"…, as well as her general inarticulateness and the fact that she appeared easily confused with respect to the direction of the ALJ's questions, and with respect to her responsibilities in terms of marshaling the medical and other evidence to support her claim….

*Id.* at *6. As in this case, the plaintiff in *Coplen* failed to assemble all of the relevant evidence that could have supported her son's claim, including critical school records. Under those circumstances, the *Coplen* court was especially critical of the ALJ's failure to seek out missing school records, which the court described as "the most important evidence" that is ordinarily relevant to determining whether a child is disabled. *Id.* at *7 (citing 20 C.F.R. §416.924a(a)(2)(iii) and (b)(7)(ii)). "It is thus clear that, especially in the case of a pro se claimant, *it is the agency that is tasked with obtaining the relevant school records.*" *Id.* (emphasis added, collecting cases). In *Coplen*, the ALJ's "entire examination of plaintiff covers less than twelve transcribed pages" with the primary questions by the ALJ "inquiring whether [the child] can study, play and eat with the other children, and generally do the same things as the other children." *Id.* at n.7. In comparison, the ALJ's 13-page examination of Plaintiff here also focused primarily on MA's ability to act in a manner similar to other children, with little focus on developing the record concerning limitations due to her pain level, including lack of physical stamina and frequent absences.

In this case, the ALJ failed to obtain school records from 2012-2014, Urgent Care records from 2014, and Children's Hospital records from around the time of the hearing in December of 2014.[4] As in *Coplen* and *Lashley*, the ALJ's failure to make a deeper inquiry and to marshal additional records in this case deprived Plaintiff of a full and fair hearing. *See Lashley*, 708 F.2d at 1052-53. The ALJ's failure to expand the record here was all the more glaring because the ALJ did not obtain a consultative exam, as did the ALJ in *Coplen,* but instead gave "great weight" to an outdated opinion of a non-examining agency physician while giving "little weight" to the opinions of MA's long-term treating pediatric rheumatologist, Alexei Grom, MD, PhD, who submitted three separate letters on her behalf (dated March 14, June 27, and November 21, 2014).

The opinion of the non-examining agency physician who reviewed MA's records, Dr. Rosenfeld, was dated April 30, 2013 – prior to the three opinion letters offered by Dr. Grom. Dr. Rosenfeld, a general pediatrician who is not a specialist in CRMO, was clearly focused on MA's medical improvement, pointing out that MA no longer requires transfusions for severe anemia. (Tr. 440, 442). Her findings of "no limitation" in any domain except for a "less than marked" limitation in the domain of health and wellbeing are based on a review of only limited medical records, with the most recent dating to February 1, 2013, and without the benefit of MA's school records, or other relevant medical records.[5] For example, Dr. Grom's records reference a limp, and 2014 records reflected "significant" physical deficits in MA's posture, range of motion, and activity level, and orthotics were prescribed to help correct MA's gait. (Tr. 512-549). In stark

---

[4]Many of these records are included in the administrative record because they were gathered by counsel in the course of this appeal.

[5]The ALJ cited Dr. Rosenfeld's opinions as the basis for finding that MA's "<u>mental</u> health impairment causes no limitations to less than marked limitations in the six domains of functioning." (Tr. 22, emphasis added). The Court assumes that this errant reference to a mental health impairment signifies no more than a typographical error.

contrast to Dr. Grom's opinions and later medical evidence of new lesions, Dr. Rosenfeld found "no chronicity of flares noted," (Tr. 442; *compare* Tr. 663-665).

Defendant argues that Plaintiff has not formally requested a sentence six remand, and that is correct. However, Plaintiff does challenge the legal sufficiency of the ALJ's decision based upon the ALJ's failure to procure additional school records and other medical evidence, under sentence four. All of the documentary evidence referenced by this Court was in existence by the time of the December 2014 hearing.[6]

In addition to pointing out the additional medical and school records that were available prior to the issuance of the ALJ's decision in April of 2015, and the ALJ's failure to delve more deeply into questions concerning MA's functional limitations or obtain MA's own testimony, Plaintiff criticizes the ALJ's failure to obtain a consultative examination or medical advisor.

In recommending remand based upon the ALJ's failure to adequately develop the record, the undersigned does not rely on any single item of missing evidence in this case. Had the ALJ obtained additional records and/or sought follow-up from Dr. Grom, or obtained a records review by a specialist who had access to a more complete set of MA's school and medical records, it is possible that a consultative examination would not have been needed. However, on the record presented here, the undersigned is left with the firm conviction that the ALJ failed to satisfy the "heightened duty" she had to ensure a full and fair hearing prior to terminating MA's benefits.

---

[6]This Court has not considered the handful of records that <u>post-date</u> the ALJ's decision, and therefore could not have been obtained by the ALJ. Instead, the referenced evidence is considered to illustrate the importance of complying with the "heightened duty" that the ALJ had to develop the record in this case, and of the impact of that failure of duty.

14

### B. Consideration of New Listing 114.09

Plaintiff's second claim of error is that remand is required for consideration of Listing 114.09, which Plaintiff asserts is the "most pertinent" listing relevant to CRMO as an auto-inflammatory disorder. Listing 114.09 pertains to inflammatory arthritis. In the course of remand recommended on other grounds, the ALJ should consider whether MA meets or medically or functionally equals any listing, including Listing 114.09 to the extent applicable.

### C. Challenge to ALJ's Findings on Functional LImitations

The ALJ's determination that MA was not disabled rests on the determination that she had no functional limitations in five out of the six functional domains, and "less than marked" limitations in the domain of health and well-being. In considering her limitations, the ALJ viewed children aged 6-12 as the point of comparison. While that age group is relevant, the undersigned notes that by the time of the hearing, MA's functional abilities might also have been compared to the abilities of adolescents, defined as age 12 to 18.

Plaintiff briefly criticizes the ALJ's finding that MA has no limitations in the domain of moving about and manipulating objects,[7] but mostly challenges the ALJ's findings in the domains of caring for personal needs and in health and physical well-being. To prove disability, MA must show "extreme" limitations in at least one domain, or "marked" limitations in at least two domains. The regulations explain that in determining whether a child has a "marked" or "extreme" limitation in any domain, the Commissioner

> will consider your functional limitations resulting from all of your impairments, including their interactive and cumulative effects. We will

---

[7]For school age children ages 6-12, this domain includes "a variety of physical activities, such as running and jumping, and throwing, kicking, catching and hitting balls." 20 C.F.R. §416.925a(j)(2)(iv). The record suggests that MA may be significantly limited in, at a minimum, running and jumping.

15

> consider all the relevant information in your case record that helps us determine your functioning, including your signs, symptoms, and laboratory findings, the descriptions we have about your functioning from your parents, teachers, and other people who know you, and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929.

20 C.F.R. § 416.926a(e)(1).

A "marked" limitation may be found "when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities." 20 C.F.R. §416.926a(e)(2)(i). For the domain of health and physical well-being, to which Plaintiff devotes most of her argument, a "marked" limitation will be found

> if you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs. For purposes of this domain, "frequent["] means that you have episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more. We may also find that you have a "marked" limitation if you have episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

20 C.F.R. §416.926a(e)(2)(iv). Evidence concerning MA's pain and constancy and frequency of symptoms suggests that MA may have at least a "marked" limitation in health and physical well-being. However, to prove disability, MA would have to show a "marked" limitation in at least two domains, or alternatively, an "extreme" limitation in health and well-being.

> "Extreme" limitation is defined as follows:
>
> 3) Extreme limitation.
> (i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your

16

> impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3). In "health and physical well-being," an extreme limitation may be found

> if you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs substantially in excess of the requirements for showing a "marked" limitation in paragraph (e)(2)(iv) of this section. However, if you have episodes of illness or exacerbations of your impairment(s) that we would rate as "extreme" under this definition, your impairment(s) should meet or medically equal the requirements of a listing in most cases. See §§ 416.925 and 416.926.

20 C.F.R. § 416.926a(e)(3)(Iv).

Plaintiff argues that the ALJ's findings of "less than marked" limitations in only one domain, with no other limitations in any other domain, are not supported by substantial evidence, because the ALJ relied almost exclusively on the RFC opinions of Dr. Rosenfeld. As previously discussed, Dr. Rosenfeld was a non-examining agency consultant who had access to only a limited and incomplete record.[8]

Plaintiff also asserts error in the ALJ's failure to give controlling weight to the opinions of Dr. Grom, a treating specialist in CRMO who has overseen MA's care since 2008. Dr. Grom wrote three opinion letters in 2014, in which he opined that MA was disabled. On the one hand, the ALJ was not required to give controlling weight to Dr. Grom's opinions on the ultimate issue of disability, because that issue is not considered

---

[8]Dr. Rosenfeld's analysis was upheld by a second non-examining consultant (not cited by the ALJ) who reviewed a May 2013 record, in which Dr. Grom stated that between 2008 and May 2013, "there were few mild flares with new bone lesions that responded to higher doses of Enbrel." (Tr 444). However, other records dated after May 2013 reflect additional flares and symptoms.

17

to be within the scope of medical opinion, but instead is expressly reserved to the Commissioner. *See* 20 C.F.R. §404.1527(d). On the other hand, all three of Dr. Grom's letters contained additional information and medical opinions that bear on MA's limitations in the various domains. For example, he opines that MA "cannot tolerate full-time school attendance," (Tr. 687), that her illness causes her to suffer "deep, aching pain," along with frequent joint swelling and gait disturbance, with unpredictable flare ups with new or intensified pain, interspersed with periods of quiet disease. (Tr. 687, 663). Dr. Grom opines that MA suffers pain and joint swelling even after aggressive treatment and physical therapy, requiring homebound instruction in lieu of school, and that her disease is under only "fair" control. (Tr. 663). He repeatedly cites the number of appointments MA has undergone as evidence of her need for "extensive specialty care," and points to imaging from May 2014 that shows "active disease" meaning a new lesion on C2, with other "deformities in her vertebrae." *Id.* His November 2014 letter references "deformities in several vertebrae and lesions on her bones," including at T2, T3, T4, T8 and T11, that causes "deep aching pain, limping and fever." (Tr. 665). He also states that MA "continue[s] to experience significant pain when attempting to complete daily activities." Tr. 665). Other medical records as well as the referenced school records could have provided additional support for Dr. Grom's opinions and at least some level of limitation in several domains. However, without such evidence, including MA's own testimony and/or a consultative exam, there simply is no complete record in this case.

      The undersigned concludes that the ALJ's failure to adequately develop a full and fair record adversely impacted her analysis of the medical opinion evidence, including Dr. Grom's opinions. For instance, a "reassuring" May 2014 record cited by

the ALJ appears to have been overweighted given the absence of other later medical records, school records, and more in-depth testimony about MA's functional limitations. Although Dr. Grom's opinions could have been better articulated or supported, the undersigned cannot find "good reasons" for the rejection of all of his opinions in light of the underdeveloped record. In short, the ALJ should re-evaluate on remand MA's limitations in the three referenced domains, including a re-evaluation of the medical opinion evidence.

### III. Conclusion and Recommendation

Remand is required to ensure a full and fair hearing at the administrative level. At the same time, the incomplete record means that it remains unclear whether MA will be found to have "extreme" limitations in at least one domain, or "marked" limitations in at least two domains.  For that reason, this is a case for remand alone, rather than for an award of benefits.

Accordingly, **IT IS RECOMMENDED THAT** the ALJ's cessation of MA's SSI benefits be **REVERSED AND REMANDED** for further evaluation under sentence four, consistent with this Report and Recommendation, and that this case be **CLOSED.**

 _/s Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

NISREEN FARAH,
on behalf of minor child, M.A.,            Case No. 1:16-cv-624

    Plaintiff                                      Black, J.
                                                           Bowman, M.J.
   v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).